UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                                         CASE NO. 8:20-mj-1518-T-60AEP

MUHAMMED MOMTAZ AL-AZHARI

**GOVERNMENT'S RESPONSE TO MOTION TO REVOKE DETENTION ORDER AND RELEASE THE DEFENDANT FROM CUSTODY**

The United States of America files this response in opposition to the motion of the Defendant, Muhammed Momtaz Al-Azhari, to revoke the Court's detention order (Doc. 27). The United States opposes the Defendant's release pursuant to 18 U.S.C. §§ 3142(e)(1), 3142(e)(3)(C), 3142(f)(1)(A), 3142(f)(2), and 3145(b).

**MEMORANDUM OF LAW**

As discussed below, the magistrate judge properly detained the Defendant because he is a serious risk of flight and a danger to the community. 18 U.S.C. § 3142(e)(1).

At its heart, the current motion is primarily a backdoor attempt to revisit the Court's probable cause determination and release the Defendant not based on his risk of flight or dangerousness, but because defense counsel believes that his legal argument regarding the charged offense will prevail at trial. *See* Doc. 27 at 1-22. In fact, only three-and-a-half pages of the Defendant's 27-page motion

even attempt to address the factors to be considered under 18 U.S.C. § 3142(g) and the Defendant's personal circumstances; much of the rest of the motion uses the applicable presumption of detention to try to shoehorn an argument about probable cause being insufficient. *See id.*

Soon after filing the instant motion, the Defendant also filed an objection to the magistrate judge's probable cause determination and moved to dismiss the criminal complaint (Doc. 29). The United States will file a separate response to that motion in which it will more thoroughly address the sufficiency of the probable cause in this case.

## I.     "I am ISIS, okay?"

By his own admission, the Defendant is a member of ISIS and a fervent supporter of that designated foreign terrorist organization. As the complaint details, the Defendant is a United States citizen who was returned to this country from Saudi Arabia in December 2018 after he was convicted of terrorism-related charges abroad. Within months of returning to the United States, the Defendant began consuming ISIS propaganda. Doc. 5 at 28. Regardless of what organization he may have supported in the Syrian civil war—which gave rise to his first terrorism charges—the Defendant revealed his affinity for ISIS not long after he came back to this country.

The Defendant was found to be consuming ISIS propaganda beginning in May 2019. Doc. 5 at 30. By September 2019, the Defendant was actively researching how to make improvised explosives devices and poisons, including a

resource called "*Mujahid guide in forensic research* and *4 easy ways to make a suicide belt.*" *Id.* at 32-33. In around February and March 2020, he began looking into acquiring guns. *Id.* at 33-35. The Defendant's interest in finding guns only intensified over the next two months, and he turned to the streets to obtain an Uzi submachinegun. *Id.* at 36-43. The Uzi was in addition to another handgun that the Defendant "literally got [] off the streets." *Id.* at 18. Spent shell casings found in the Defendant's car show that he fired the Uzi. *Id.* at 46. Around the same time, the Defendant engaged an undercover FBI agent to try to get a fully automatic AK-47 rifle, a Glock pistol, a silencer, a threaded barrel, and extended magazines. *Id.* at 9-23. Those plans were only thwarted when the Defendant was arrested on state charges for unlicensed carrying of a concealed firearm—a third gun that he had somehow acquired. *Id.* at 22.

But even the Defendant's state arrest did not deter him from his plans to obtain firearms and provide material support to ISIS. In late May 2020, the Defendant began interacting with a confidential human source ("CHS-1"). *Id.* at 53-62. Over a period of days, he converted CHS-1 to Islam and asked for his help in carrying out attacks and robberies, to include killing police officers and members of the military. *Id.* The Defendant also asked CHS-1 to help him obtain a Glock pistol, an AK-47 rifle, and silencer, just as he had asked the undercover agent to do. *Id.* FBI agents arrested the Defendant when he took possession of the Glock pistol, a silencer, and an extended magazine. *Id.* at 62.

During these busy months, the Defendant prepared himself for a deadly attack in support of ISIS. He ordered gear for an attack, such as a tactical vest, a skull facemask, a backpack USB interface, a drone, and a long, hooded winter coat. *Id.* at 25. He also surveilled targets, to include Honeymoon Island State Park and other "busy" area beaches. *Id.* at 49, 51-53. Contemporaneously, the Defendant pledged allegiance to ISIS and rehearsed portions of his attack. *Id.* at 44-45, 49. In relevant part, he boasted:

- "Know America. Today is your emergency. Today we kill from you guys like you killed from us. I pledge allegiance to Sheik Abu Ibrahim al-Hashimi[1] when you consider what I'm about to do." *Id.* at 49.

- "Hey you, get on the floor. Get on the floor now. Don't you move, don't you move, I'm telling you, I will kill you. Get on the floor, God willing, the exalted." *Id.* at 44.

- "God willing, the exalted. This is revenge for my brothers Al Muwahideen *[the monotheists]* in Guantanamo in general, and for my brother [redacted] in particular. God willing, he may be praised and exalted. God willing, this is a revenge for all my Muslim brothers in Iraq and al-Sham *[Syria]*[2] and everywhere." *Id.* at 44-45.

- "In the name of God, Allah Akbar *[God is great]*…God willing, the exalted, the Islamic State is lasting." *Id.* at 45.

If there was any doubt that the Defendant identified as a member of ISIS and endeavored to work under its direction or control, his interactions with CHS-1 erased that doubt. The Defendant bluntly told CHS-1, "I am ISIS, okay?" *Id.* at 57. He further said that he wanted to go live with the "good brothers" in Syria

---

[1] Al-Hashimi is the second and current "Caliph" of ISIS and is considered its leader.
[2] ISIS is an acronym for the "Islamic State of Iraq and al-Sham." Doc. 5 at 2, 4.

4

and Iraq and explained, "I want to join ISIS. They are the real followers. I've lived there before. I enjoyed that life." *Id.* The Defendant added, "We either go over there, to Syria and Iraq and live between Muslims, and fight with them against the Syrian Army and then the Iraqi army, or we stay here in America and we keep, we keep making their lives hell until Allah accepts us as martyrs." *Id.* He went on to explain the difference between al-Qaeda and ISIS, remarking that ISIS consists of all jihad groups together, and said, "We don't care about the name. We care about the purpose. America is afraid because we are united." *Id.* at 58. The Defendant repeatedly referred to ISIS by the collective words "we" or "our," including by saying that "our target" is to establish an Islamic state of Islam, and he claimed that he had been trying to do so for more than six years (which encompasses his time in Saudi Arabia). *Id.*

The Defendant also continually expressed his admiration for Pulse nightclub shooter, and fellow ISIS "soldier" (*Id.* at 36), Omar Mateen. He searched for Mateen's grave in South Florida and visited the Pulse nightclub memorial on at least two occasions—including one time, ominously, in the dead of night and around the same time that Mateen's attack had occurred. *Id.* at 35-37, 51-52. As discussed below, the Defendant spoke glowingly about how Mateen had killed 49 people and injured 53 "in the gay club." *Id.* at 60. Even the weapons that the Defendant tried to acquire—the Glock pistol, in particular—

were a dark homage to Mateen.[3]  In the Defendant's own words:

> "Me, I eventually, that's how I want to die, to be honest.  I want to die, you know, in a shootout with the kuffar *[disbelievers/non-Muslims]*…You know like, brother Omar Mateen in Orlando did.  He took 49 with him… He went in with his AR-15 and his 9mm, pow pow pow, and won't stop, just pulled the trigger – every kaffir *[infidel]* he sees in front of him.  That's what I want to do.  Inshallah *[God willing]*…[E]ver since that happened, they shut, they shut it down.  So, mashallah *[God has willed it]*, look what he did, he caused, he made a difference."

*Id.* at 60.

Despite the facts set out above and in the complaint, the Defendant alleges that the government "presented no evidence in any form that [he] attempted to work under the direction or control of ISIS."  Doc. 27 at 9.  He then uses that assertion to undermine the statutory presumption of detention and the other § 3142(g) factors that warrant detention.  However, the facts are clear that the Defendant attempted to violate 18 U.S.C. § 2339B, and certainly under a probable cause standard.

Probable cause is defined as "facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense."  *Grider v. City of Auburn,* 618 F.3d 1240, 1257 (11th Cir. 2010) (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).  The Defendant claims that, contrary to the findings of two magistrate judges, this low bar has not been met because he

---

[3] *See* Bart Jansen, "Weapons gunman used in Orlando shooting are high-capacity, common," *USA TODAY*, June 14, 2016, *available at* https://www.usatoday.com/story/news/2016/06/14/guns-used-kill-49-orlando-high-capacity-common-weapons/85887260/.

6

did not in some way endeavor to place himself or someone else under ISIS's direction and control.  Doc. 27 at 16.  However, that argument overlooks the Defendant's own words and actions, as well as the reality of ISIS's modus operandi.

ISIS has called for its supporters to carry out the type of attack that the Defendant attempted to conduct here.  As laid out in the complaint, ISIS has encouraged its followers who are unable to travel to the Middle East to commit jihad by fighting (also known as making "hijrah") to instead conduct attacks in their home countries.  Doc. 5 at 5-7.  The very title of one such exhortation was "Lone Wolfs Rise Up."  *Id.* at 7.  By optimizing the types of social media and internet platforms that the Defendant himself consumed and used, ISIS spreads that message inciting violence across the globe.  *Id.*  While ISIS may maintain a formal, centralized structure in parts of the Middle East, it allows any like-minded follower to join its cause by committing acts of violence in support of an Islamic state.  As far back as September 21, 2014, now-deceased ISIS spokesperson Abu Muhammad al-Adnani called for followers to take action and show their support for ISIS through acts of violence in their homelands.  *Id.* at 6; Samantha Arrington Sliney, *Right to Act: United States Legal Basis Under the Law of Armed Conflict to Pursue the Islamic State in Syria*, 6 U. Miami Nat'l Sec. & Armed Conflict L. Rev. 1, 2 (2016).  Al-Adnani reiterated that called in May 2017, stating, "If the tyrants have closed in your faces the door of hijrah, then open in their face the door of jihad and make their act a source of pain for them…The smallest action

7

you do in the heart of their land is dearer to us than the largest action by us, and more effective and more damaging to them."[4] What's more, common sense and our experience tell us that this is how ISIS now carries out its mission to attack the United States and other Western countries. Over the past several years, there have been numerous publicized "lone wolf"-type terrorist attacks carried out in Florida, California, Texas, New York, the United Kingdom, France, Belgium, Spain, Australia, and elsewhere, in which the attackers have claimed to support ISIS or for which ISIS has claimed responsibility.[5] To ignore those attacks and ISIS's role in facilitating and benefiting from them is to close one's eyes to reality.

Nor does the available case law support the Defendant's argument. The two Eleventh Circuit cases that are directly on point demonstrate as much. *See United States v. Suarez*, 893 F.3d 1330 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 845 (2019); *United States v. Augustin*, 661 F.3d 1105 (11th Cir. 2011). In *Suarez*, the defendant was convicted of violations of 18 U.S.C. §§ 2332a and 2339B after he plotted a bomb attack on a Key West beach in support of ISIS. 893 F.3d at 1333.

---

[4] Griff Witte et al., "Flow of foreign fighters plummets as Islamic State loses its edge," WASHINGTON POST, Sept. 9, 2016, *available at* https://www.washingtonpost.com/world/europe/flow-of-foreign-fighters-plummets-as-isis-loses-its-edge/2016/09/09/ed3e0dda-751b-11e6-9781-49e591781754_story.html

[5] *See* "Global Terrorism Database," NATIONAL CONSORTIUM FOR THE STUDY OF TERRORISM AND RESPONSES TO TERRORISM, accessed on June 17, 2020, *available at* https://www.start.umd.edu/gtd/; Tim Lister et al., "ISIS goes global: 143 attacks in 29 countries have killed 2,043," *CNN*, Feb. 12, 2018, *available at* https://www.cnn.com/2015/12/17/world/mapping-isis-attacks-around-the-world/index.html; Camila Domonoske et al., "Suspect In New York City Truck Attack Accused Of Terrorism In Federal Complaint," *NPR*, Nov. 1, 2017, *available at* https://www.npr.org/sections/thetwo-way/2017/11/01/561304014/suspect-in-new-york-city-truck-attack-worked-as-commercial-truck-uber-driver.

The FBI learned of the defendant's posting of ISIS propaganda and thereafter introduced a confidential source and an undercover agent to the defendant to disrupt the plot. *Id.* at 1332-1333. Challenging the sufficiency of the evidence on appeal, the defendant claimed that he did not provide material support or resources. *Id.* at 1334. The Eleventh Circuit disagreed, holding that the government had offered "substantial evidence" showing that Suarez knowingly provided material support to ISIS. *Id.* at 1335. The court noted the following:

> "Through his Facebook account, Suarez posted ISIS propaganda, requested help in building bombs, attempted to recruit others to join him in attacks, and filmed a recruitment video to this end…He coordinated directly with individuals whom he believed to be members of ISIS in order to acquire a bomb. He provided the money and materials for the bomb, and he accepted the bomb while reiterating his plan to detonate it on a crowded beach. On this basis, a reasonable jury could conclude that Suarez attempted to direct his services to the benefit of a foreign terrorist organization."

*Id.* It went on:

> "Suarez argues that there was no coordination or direct contact with an actual foreign terrorist organization because he had contact only with the government informant and undercovers. **But it is irrelevant that he did not make contact with ISIS, because the law requires only that Suarez directed (or attempted to direct) his services to ISIS**…**Suarez had the requisite intent to coordinate with ISIS and direct his services to ISIS, and he took substantial steps to do so**. Accordingly, there was sufficient evidence to convict Suarez for attempting to provide material support to a foreign terrorist organization…."

*Id.* (emphasis added).

Likewise, in this case, the Defendant had the intent to coordinate with ISIS, directed his services to that foreign terrorist organization, and took substantial steps to do so. The Defendant self-identified as an ISIS member,

9

pledged allegiance to ISIS, consumed ISIS propaganda, spoke about wanting to join ISIS fighters overseas, and said that his motive was to avenge offenses against Muslims and to help establish an Islamic state.  He then acquired the items needed for an attack, including a handgun, silencer, and extended magazine.  As a United States citizen living in this country after already having been imprisoned in, and removed from the, Middle East, the Defendant did everything that he conceivably could do to align himself ISIS.  Furthermore, he claimed to CHS-1 that he had been trying to help establish an Islamic state for more than six years, which suggests that he was a member, or at least a supporter, of ISIS when he lived abroad in Saudi Arabia.  He also referenced avenging a specific "brother" and member of the "muhawhideen" who had been imprisoned at Guantanamo Bay detention camp.  Thus, it seems likely that the Defendant did have contact with ISIS members overseas.

*Augustin* also shows that there is probable cause to support the § 2339B charge here.  In *Augustin*, the defendants were charged with violating § 2339B and other crimes.  661 F.3d at 1115.  In relevant part, the defendants had jointly taken an oath to support Al Qaeda, photographed and videotaped federal buildings, and discussed a plot to attack those buildings.  *Id.* at 1111-1114, 1119.  But there was no evidence that they had communicated or worked directly with any Al Qaeda members or operatives.  *See id.*  The Eleventh Circuit rejected the defendants' claim that their conduct did not rise to the provision of personnel under § 2339B(h).  *See id.* at 1119.  It held that, under of the totality of the

circumstances, "the jury was free to conclude that [the defendants], though immediately under [one defendant's] command, were ultimately volunteering themselves to serve under the direction and control of Al Qaeda." *Id.* The jury could decide "from the entirety of the oath ceremony, including the revelation of the plan to blow up FBI offices across the country, and the [defendants'] later actions in taking photographs and video footage of the Miami federal buildings and presenting them to [Defendant] Assaad, that [Defendants] Augustin, Phanor, and Augustine had volunteered to work under Al Qaeda's direction or control." *Id.*; *see also United States v. Elshinawy*, No. CR ELH-16-0009, 2017 WL 876484, at *10 (D. Md. Mar. 6, 2017) (favorably citing *Augustin*).

The evidence set forth in the complaint and adduced at the preliminary hearing establishes that the Defendant attempted to work under ISIS's direction or control.[6] *See* 18 U.S.C. § 2339B(a)(1) and (h). The facts and circumstances are sufficient to warrant a prudent man in believing that the Defendant has committed a violation of § 2339B. *Grider,* 618 F.3d at 1257.[7]

---

[6] The evidence also shows that the Defendant attempted to recruit CHS-1 to work under ISIS's direction or control.

[7] The United States notes that nothing that the complaint affiant said at the preliminary hearing undermines this conclusion. Indeed, the Defendant's own citation to the hearing transcript confirms as much. Doc 27. at 6-7. Special Agent Hazel testified, in relevant part:
"Q. And certainly you think he—he sympathized with ISIS, correct?
A. Yes.
Q. And you think he wanted to advance those goals, correct?
A. Yes. […]
Q. All right. And he was just seeking to achieve their—their goals on his own?
A. Yes."
Doc. 27 at 7.

11

## II. "I don't want to take four or five, no.  I want to take at least 50." "Of course, they're going to issue a warrant"

This Court should not release the Defendant from custody because he is a serious risk of flight and a danger to the community.  18 U.S.C. § 3142(e)(1).  The United States persists in moving for his detention pursuant to 18 U.S.C. § 3142(f)(1)(A) and (f)(2).

The Defendant having been charged with a "federal crime of terrorism," the law presumes that he should be detained.  18 U.S.C. § 3142(e)(3)(C).  That presumption of detention is warranted because the Defendant attempted to provide material support or resources to ISIS by carrying out a mass shooting and conducting robberies.  In the course of doing so, he pledged his allegiance to ISIS, rehearsed his attack, acquired at least four guns and ammunition, and scouted potential targets.  Were it not for the intervention of law enforcement, it is likely that the Defendant would have killed or injured innocent people in his quest to support a foreign terrorist organization.  As he told CHS-1, referencing the lives lost in the Pulse massacre, "I don't want to take four or five, no.  I want to take at least 50."  Doc. 5 at 60.  And, although he had brief interactions with CHS-1 and the undercover agent, those violent plans originated squarely with the Defendant.  The government agents did not coax the Defendant to plot acts of terror, but merely offered to help him acquire more weapons—after he had already obtained three guns, including an Uzi, on his own.  The Defendant took himself down this path in at least May of last year, if not earlier.  If he were to be

12

released, there is every reason to assume that the Defendant will find a way to resume his pursuit of jihad at all costs.

The Court can assume as much because the Defendant's arrest on state charges did nothing to deter him from his criminal aspirations. On May 1, 2020—in the midst of the FBI investigation—the Tampa Police Department arrested the Defendant for unlicensed carrying of a concealed firearm. He was thereafter charged in the Thirteenth Judicial Circuit Court of Florida, Hillsborough County (case no. 20-CF-005200-A), and released after posting bond. As a condition of his release, the state court issued an order prohibiting the Defendant from possessing any firearms. Yet, despite that explicit order, and the obvious fact that he was otherwise on pretrial release for a felony charge, the Defendant continued with his plans to support ISIS and acquired a Glock pistol and silencer from CHS-1. Had the Defendant picked up a second state charge, instead of the current federal charge, it is likely that a state court judge would have imposed no bond on his original case. Not only that, the Defendant was recorded saying the following to CHS-1 about his state case on May 24, 2020:

> "I was thinking about not even going to court and saying, 'Fuck that.' Just, I was thinking about, I was thinking about just hiding…I mean, of course, they're going to issue a warrant…It's mentioned in the paperwork."[8]

---

[8] This quotation is taken from a transcript that the FBI has prepared of the recorded conversations that day between the Defendant and CHS-1.

13

If the Defendant was willing to flout court orders and skip bond on his pending state charges for a third degree felony, then he has even more reason to flee in this case. The United States estimates that the Defendant will face a guideline range sentence of 292-365 months' imprisonment if he is convicted at trial. *See* U.S.S.G. §§ 2M5.3 and 3A1.4. Even if the Defendant faces only the single § 2339B count currently charged, and not additional counts whose sentences can be run consecutively, that means that he will guideline out to the statutory maximum of 20 years' imprisonment. The Defendant, who has already professed his hatred for the United States and his desire to fight overseas, has a strong incentive to flee rather than face that sentence.

The evidence against the Defendant is strong. That said, even if the Court were to accept the Defendant's argument that the "weight of the evidence" factor points in his favor, every other factor under § 3142(g) does not. The charged offense is a "federal crime of terrorism" (§ 3142(g)(1)) and a dangerous crime, the Defendant already has been convicted of separate terrorism charges (§ 3142(g)(3)(A)) and was on release in state court pending trial when he committed this offense ((§ 3142(g)(3)(B)), and the Defendant poses an extreme danger to the community in this district (§ 3142(g)(4)), which he desires to terrorize. Those other factors do not simply wilt away when the parties offer differing legal theories about the evidence here; rather, they are brought into stark relief. Even the Defendant's own proposal to live with his father and abide by restrictions fails to move the needle on release. The Defendant's father is not a

suitable custodian or bond cosigner because he was imprisoned on terrorism charges alongside the Defendant in Saudi Arabia, and the Defendant has stated that he wants to kill him because he is not a true Muslim.  Doc. 5 at 5, 58 ("You die, you win.  I want to kill a kaffir *[infidel]*.  I want to kill my dad.").  As for "a firearms restriction, a search condition, and limitations on his internet access," the Defendant has already proven that a judge's orders mean nothing to him in his quest to become a martyr for ISIS.  Doc. 27 at 26.

The statutory presumption of detention has not been rebutted, and the Defendant remains a serious risk of flight and a danger to the community.

### III.  Conclusion

For all of the foregoing reasons, the Court should deny the Defendant's motion and uphold his detention under 18 U.S.C. § 3145(b).

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By:  */s/ Patrick D. Scruggs*
Patrick D. Scruggs
Assistant United States Attorney
United States Attorney No. 140
400 North Tampa Street, Suite 3200
Tampa, Florida   33602
Telephone:      (813) 274-6000
E-mail: patrick.scruggs@usdoj.gov

**U.S. v. Muhammed Al-Azhari**              **Case No. 8:20-mj-1518-T-60AEP**

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Samuel Landes, Esq.

*/s/ Patrick D. Scruggs*
Patrick D. Scruggs
Assistant United States Attorney
United States Attorney No. 140
400 North Tampa Street, Ste. 3200
Tampa, Florida   33602
Telephone:   (813) 274-6000
Facsimile:   (813) 274-6125
E-mail:   patrick.scruggs@usdoj.gov